IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Dependency of<br><br>J.H.W., JR., and J.K.W. | No. 87390-3-I (consolidated with No. 87391-1-I)<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR RECONSIDERATION, WITHDRAWING OPINION, AND SUBSTITUTING OPINION |

Appellant J.H.W. moved for reconsideration of the published opinion filed on January 5, 2026. The panel considered the motion pursuant to RAP 12.4 and determined that the motion should be granted in part and denied in part, the opinion should be withdrawn, and a substitute opinion be filed.

Now, therefore, it is hereby

ORDERED that the appellant's motion for reconsideration is granted in part and denied in part; and it is further

ORDERED that the published opinion filed on January 5, 2026, is withdrawn; and it is further

ORDERED that a substitute published opinion be filed.

WE CONCUR:

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| In the Matter of the Dependency of | No. 87390-3-I (consolidated with No. 87391-1-I) |
| --- | --- |
| J.H.W., JR., and J.K.W. | DIVISION ONE |
| | PUBLISHED OPINION |

SMITH, J. — J.H.W. is the father of two boys, J.H.W., Jr., born in 2018, and J.K.W., born in 2020. On October 30, 2024, the father's parental rights were terminated. The father appeals, asserting that the Department of Children, Youth and Families failed to provide all necessary and reasonable services or court-ordered visitation; that the State failed to prove there was little likelihood the father's parental deficiencies would be remedied in the near future; that the State failed to prove that the father's relationship with the children would diminish their prospects for early integration into a stable and permanent home; and that termination was in the children's best interest.

Substantial evidence supports the court's orders and finding no error, we affirm in part and remand specifically for findings consistent with the requirement RCW 13.34.200(3) to address the children's sibling relationships.

FACTS

Background

J.H.W. is the father of two boys, J.H.W., Jr., born in 2018, and J.K.W., born in 2020. J.H.W., Jr., lived with the father and mother and the mother's two

older children.[1]  The father also has two older children who lived outside the home with their respective mothers.

In March 2019, the Department received a complaint alleging negligent treatment of J.H.W., Jr.  The complaint stated that drug use, drug sales, and intimate partner violence were occurring in the home.  The mother reportedly drank alcohol and used drugs to such an extent that she was unable to care for J.H.W., Jr.  Family members reported that the mother said the father threatened to hurt her and "shoot up the apartment."  Family members also reported that when J.H.W., Jr., was born, he was affected by drugs and alcohol and had crystal meth in his system.  J.H.W., Jr., and his two older siblings were removed from the home.

### 2019

In June 2019, J.H.W., Jr., was found dependent as to the father under RCW 13.34.030(6)(c).  At the time of dependency, the findings on the father's deficiencies included:

> Substance abuse issues resulting in risk of child neglect and inability to meet the children's needs; criminal activity which has resulted in frequent incarceration, making the father unavailable to care for the children; untreated issues related to perpetration of domestic violence and risk of exposing the children to violence; and inadequate parenting skills to provide for the children's emotional, physical, mental and developmental needs.

The dispositional order required the father to: (1) submit to random urinalysis (UA) testing; (2) have a drug and alcohol evaluation and follow all treatment

---

[1] The mother had two older daughters, ages 12 and 10 at the time, who were living in the home. The father is not the father of the two daughters.

recommendations; (3) have a parenting assessment and follow all recommendations; (4) have in-home service upon the child's return home; and (5) take a domestic violence batterer's assessment by a state certified provider and follow through with any treatment recommendations. The order called for supervised visitation up to two times a week. The Department's social worker gave the father referrals for chemical dependency, UA, and visitation.

After J.H.W., Jr., was removed from the father's care, the father had supervised visits with J.H.W., Jr., mostly at the Department's office and in a park. From June 2019 to August 2019, the father completed a total of seven random weekly UA tests. All tests were positive for cannabis, and one test was positive for alcohol and amphetamines.

In November 2019, the father completed a substance use evaluation. The evaluation recommended Level 1 intensive outpatient treatment for a minimum of 36 sessions, followed by Level 1 relapse prevention for a minimum of 24 sessions, outpatient for a minimum of 12 sessions followed by continuing care and monthly monitoring. At trial, the court found that the father did not complete the recommended follow-up treatment.

<u>2020</u>

In early 2020, the father participated in a parenting assessment but did not follow through with the treatment recommendations.[2]

---

[2] The parental assessment recommendations included a domestic violence assessment, which the father did not complete.

In May 2020, the mother gave birth to J.K.W. on the floor of their home. A family member reported that the father and mother were in a physical argument when the mother's water broke. The father then dragged the mother into the bathroom and told her to have the baby in the bathroom. J.K.W. was removed from his parents' care three days after he was born. J.K.W. was exposed to multiple drugs in utero.

In September 2020, the father was arrested for assaulting and raping the mother and was held in custody at the King County Jail and Regional Justice Center (King County jail). J.H.W., Jr., and J.K.W. were placed with maternal relatives. At the time of placement, J.H.W., Jr., was under two years old and had been out of the parents' home for 18 months. J.K.W. was four months old and had been out of the parents' home since he was three days old.

Initially, while the father was in custody, he did not have any visits with the boys. Natasha Savage, J.H.W., Jr., and J.K.W.'s social worker, testified that significant technology issues occurred during the COVID-19 pandemic lockdown, and the King County jail initially did not have video visitation options.

<u>2022</u>

The King County jail set up a video visitation system, and Shellie Roush, the Department's social worker assigned to the case at the time, testified that once the system was set up, video visitation commenced fairly quickly. In February 2022, weekly video visitation began between the father and the boys. In May 2022, the father was found guilty of rape in the second degree – domestic

violence; assault in the second degree – domestic violence with deliberate cruelty; and assault in the second degree – domestic violence against the mother. In July 2022, the father was transferred from the King County jail to the Washington Corrections Center (Shelton) in Shelton, Washington. In October 2022, he was then moved to Coyote Ridge Corrections Center (Coyote Ridge) in Connell, Washington. During the father's stay in Shelton, he did not have visitation with J.H.W., Jr., or J.K.W. The father did not have video visits in November and December 2022.

### 2023

In early 2023, Coyote Ridge changed to a different video visitation technology system. Regina Austin, the Department's social worker, reported having significant problems with the technology and setting up visitation. Testimony at trial established that the Department changed the father's social workers frequently, and transfer of information between social workers was very limited. Savage also testified that the Department of Corrections was not responsive to the Department's e-mail requests regarding what services they had available to the father. The father's attorney made over 15 requests to the Department in the span of three months to facilitate visitation.

In April 2023, the father reported that he believed he had Cherokee ancestry, and the court ordered that the Indian Child Welfare Act of 1978, § 4(1)(i), 25 U.S.C.A. § 1903(4), and Washington State Indian Child Welfare Act, chapter 13.38 RCW, applied to J.H.W., Jr., and J.K.W.'s case. The application of

these statutes required that the Department engage in active efforts to provide services. The court also ordered the Department to provide visitation.

In May 2023, the father's weekly video visitations with J.H.W., Jr., and J.K.W. resumed. The boys' foster family continued to send the father regular written updates and pictures of the boys. The father enrolled in four online courses through Coyote Ridge's Reentry Life Skills program: parenting, substance abuse, domestic violence, and anger management. The father notified the Department of his enrollment and the Department paid for the father's courses.

In June 2023, the mother relinquished her parental rights and the father's termination trial was set for June 26, 2023. In July 2023, after the Attorney General's Office contacted the appropriate tribes and federal agencies, all three Cherokee tribes that were contacted responded that the children were not eligible for membership in their tribes. Thereafter, no reason existed to believe the boys had Indian heritage and the Indian Child Welfare Act and the Washington State Indian Child Welfare Act no longer applied to the proceeding.

In September 2023, the father's rights were terminated. In October 2023, this court reversed the father's conviction for rape in the second degree and ordered a new trial. As a result of the successful appeal, the father's termination case was also reopened.

Kimberly Nevala, the children's court appointed special advocate (CASA), noted that while living with their foster family, the children did well in their

placement and were well bonded with their caregivers.  J.H.W., Jr., attended preschool and had an individualized education program (IEP) for behavioral issues.

J.H.W., Jr., was diagnosed with attention deficit hyperactivity disorder (ADHD).  In December 2023, the Department notified the father of J.H.W., Jr.'s, ADHD diagnosis and requested permission for J.H.W., Jr.'s, medication.  Allison Newton-Moore, a social worker, testified that the father did not agree with giving J.H.W., Jr., medication, believing that J.H.W., Jr., was misunderstood and he did not have a diagnosis that needed medication.  After the medication was approved, J.H.W., Jr.'s, family and teachers noticed a change in behavior.  He was a lot more stable, able to play and interact better with other children and did not have outbursts and violent tantrums.

<u>2024</u>

In August of 2024, a jury found the father guilty of rape in the second degree – domestic violence; assault in the second degree – domestic violence with deliberate cruelty; and assault in the second degree – domestic violence against the mother and sentenced to 158 months.  The father's expected release date is 2032.

In October 2024, the father's parental rights were terminated.  The court held that the father was unfit to parent the children and had not remedied his parenting deficiencies.  The court also noted that the father would be incarcerated for at least the next seven years.  The court found that the father

was deprived of time with his children when he did not have visitation for many months while awaiting trial and after his first conviction. However, the father was provided visitation once the technology issues were remedied. The court found the Department complied with the requirements of RCW 13.34.136 because it offered the father the visits and services that were reasonably available. The court found that the lack of video visits was not determinative of establishing whether the father had a meaningful role in his children's lives.

Additionally, the court found that before the father was in custody, the Department offered the father all required services and visitations, and that while still in the community, the father tested positive in all his UAs and failed to attend substance use disorder assessments and treatment. Lastly, the court found that even if the Department offered more services to the father, such as drug and alcohol treatment, the services would not make the father a fit parent within the foreseeable future because he will be incarcerated for seven or more years.

The father appeals.

## ANALYSIS

The goal of child welfare is to "reunite the child with the legal parents if reasonably possible." *In re Parental Rts. to K.J.B.*, 187 Wn.2d 592, 597, 387 P.3d 1072 (2017). Parents have a "fundamental liberty and privacy interest in the care, custody, and companionship of their children." *In re Parental Rts. to K.M.M.*, 186 Wn.2d 466, 477, 379 P.3d 75 (2016). " 'The due process clause of the Fourteenth Amendment protects a parent's right to the custody, care, and

companionship of [his or] her children.' " *K.J.B.*, 187 Wn.2d at 597 (alteration in original) (quoting *In re Welfare of Key*, 119 Wn.2d 600, 609, 836, 836 P.2d 200 (1992)). But, this right is not absolute. When " 'parental actions or decisions seriously conflict with the physical or mental health of the child, the State has a parens patriae right and responsibility to intervene to protect the child.' " *K.M.M.*, 186 Wn.2d at 477 (quoting *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980)). The State may interfere with a parent's constitutional right "only if [it] can show that it has a compelling interest and such interference is narrowly drawn to meet only the compelling state interest involved." *In re Custody of Smith*, 137 Wn.2d 1, 15, 969 P.2d 21 (1998). To terminate the parent-child relationship, the State must meet a two-prong test. The first prong has six elements under RCW 13.34.180(1) that focus on the adequacy of the parent. *K.J.B.*, 187 Wn.2d at 597-98. The second prong focuses on the best interest of the child. *K.J.B.*, 187 Wn.2d at 598. The first prong must be satisfied to reach the second prong. *K.J.B.*, 187 Wn.2d at 598.

<u>The Department's Burden Under RCW 13.34.180(1)(d)</u>

The father contends that the trial court erred when it found that the Department met its burden under RCW 13.34.180(1)(d) that all necessary and reasonably available services were provided. RCW 13.34.180(1)(d) states that a petition seeking termination shall allege "that the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental

deficiencies within the foreseeable future have been expressly and understandably offered or provided." Under RCW 13.34.136(2)(b)(i)(A), if the parent is incarcerated, the Department "must include treatment that reflects the resources available at the facility where the parent is confined." To terminate a parent's rights, the State must prove the elements of the statute by clear, cogent, and convincing evidence. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 930, 976 P.2d 113 (1999). Evidence is clear, cogent, and convincing "when the ultimate fact in issue is shown by the evidence to be 'highly probable.' " *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (internal quotation marks omitted) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). A trial court's "findings of fact will not be disturbed on appeal if they are supported by 'substantial evidence.' " *Sego*, 82 Wn.2d at 739 (quoting *Sylvester v. Imhoff*, 81 Wn.2d 637, 739, 503 P.2d 734 (1072)). In an appellate review, deference to the trial court is particularly important in dependency cases. *K.R.*, 128 Wn.2d 129 at 144.

### *Visitation*

The father argues that the Department failed to provide all court ordered services and visitation. Under RCW 13.34.136(2)(b)(ii)(A), "[v]isitation is the right of the family, including the child and the parent, in cases in which visitation is in the best interest of the child. Early, consistent, and frequent visitation is crucial for maintaining parent-child relationships and making it possible for parents and children to safely reunify."

Once the children were removed from the home, and before the father's incarceration, the Department facilitated visitation between the father and J.H.W., Jr. After the father's incarceration in King County jail, the father did not have visitation for 16 months. Savage testified that during the COVID-19 pandemic lockdown, the King County jail initially did not have video visitation set up. Once King County jail's video visitation was set up, the father and the boys resumed visitation. Savage testified that when the father was transferred to Shelton, video visitation was not allowed. At Coyote Ridge, Austin testified that she encountered barriers to setting up visitation and the application process was unclear.[3] Although the father's visitation was interrupted for a significant amount of time while he was incarcerated, the Department showed that it made reasonable efforts to provide visitation.

### All Necessary and Reasonably Available Services

The father also claims that the Department failed to provide all necessary and reasonably available services because they failed to provide therapeutic visitation and bonding and attachment services once visitation began.

"At a minimum, [the Department] must provide a parent with a list of referral agencies that provide those services." *In re Dependency of D.A.*, 124

---

[3] Austin testified that there were barriers at Coyote Ridge to attaining visitation for the father. After Austin completed Coyote Ridge's online application, she testified that the facility notified her that she incorrectly completed the application and the caregivers had to complete the application. Austin informed the caregivers to complete the required application and notaries. Austin testified that Coyote Ridge was not clear on how she incorrectly completed the application. Austin maintained contact with Coyote Ridge staff throughout the application process.

Wn. App. 644, 651, 102 P.3d 847 (2004). A necessary service is a "service 'needed to address a condition that precludes reunification of the parent and child,' and may include counseling, mental health treatment, and educational programs." *In re Parental Rts. to D.H.*, 195 Wn.2d 710, 719, 464 P.3d 215 (2020) (internal quotation marks omitted) (quoting *K.M.M.*, 186 W.2d at 480.). " 'Where the record [in a proceeding on a petition to terminate parental rights] establishes that the offer of services [to the parent] would be futile, the trial court can make a finding that the Department has offered all reasonable services.' " *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.2, 225 P.3d 953 (2010) (quoting *In re Welfare of M.R.H.*, 145 Wn. App. 10, 25, 188 P.3d 510 (2008)).

The Department's social worker testified that the father's disposition order required him to participate in chemical dependency assessment, UAs, and domestic violence services. Roush testified that before the father's incarceration, she gave referrals for a chemical dependency assessment and UA testing. The father repeatedly tested positive for cannabis in his UAs. Although the father completed a substance abuse evaluation, he did not complete the recommended treatment.

The father claims that once he was incarcerated, the Department did not reasonably offer services to him. However, Roush testified that because of the COVID-19 pandemic restrictions, parenting assessments, domestic violence assessments, and chemical dependency evaluations were not available while the father was at King County jail. Roush testified that she contacted the jail to ask if

somebody could offer services, and the jail did not identify anyone that she could contact to discuss how to obtain services for the father. Additionally, Roush stated that "COVID profoundly shut down the ability for service providers and for services." While at King County jail, the father did not ask for additional services beyond his dispositional order.

Austin stated that the Department's ability to provide services was dependent on what services the correctional facilities had available. Austin also testified that whether the correctional facility offered services was also dependent on COVID-19 protocols, stating that "at the time of COVID, a lot of providers were not willing to go into jails even if the jail allowed" it. Similarly, Savage found difficulties in finding providers during the COVID-19 pandemic. Savage testified, in "2020 we had all those limitations with COVID. And actually[,] we still suffer because a lot of . . . providers stopped contracting with the [Department]."

When the father was transferred to Coyote Ridge, the Department was initially unable to provide referrals for the father's services.[4] In December 2023, Newton-Moore was assigned as the father's social worker and offered a substance use disorder assessment, a parenting assessment, and a domestic violence assessment. The father completed the substance use assessment and a parenting assessment. Samantha Patton, a licensed therapist, conducted the parenting assessment, and she recommended a parenting class, domestic

---

[4] Austin testified that she was unable to make efforts to find service providers. Austin also testified that she did not know where the father was even though she sent him a service letter.

13

violence assessment, and weekly therapy sessions. Patton testified that the father would need to complete these recommendations before he would be able to safely parent. The father also took the initiative to enroll in four classes through the Reentry Life Skills program: Parenting Skills, Substance Use, Anger Management, and Domestic Violence. These classes were not programs referred to the father to correct his parenting deficiencies. Although the father's enrolled programs did not directly address his dispositional order, the Department eventually paid for his courses.

Before the COVID-19 pandemic and the father's incarceration, he had ample opportunity to utilize the Department's referrals. Once the father was incarcerated, the Department met its obligation pursuant to RCW 13.34.180(1)(d) to offer or provide all necessary services reasonably available because no referred services were initially available at the King County jail or Coyote Ridge. When services were available at Coyote Ridge, the Department made the appropriate referrals. Despite the lack of available services in the father's disposition order, the Department covered the cost of alternative courses identified by the father. Specifically, nothing in the record supports that bonding or therapeutic services were available at any time at any of the correctional facilities or were requested by the father. The Department met its obligation to provide all necessary and reasonably available services.

*Futile*

The father contends that the Department cannot prove that visitation and attachment and bonding services would have been futile. Our Supreme Court has found that "the provision of services is futile where a parent is unwilling or unable to participate in a reasonably available service that has been offered or provided." *K.M.M.*, 186 Wn.2d at 483.

Substantial evidence shows that the father had little, if any relationship with the children before his incarceration, and the children struggled to engage with him during the visitations because it occurred over video and because of the children's ages. Those considerations along with the father's lengthy sentence, led the court to find that little likelihood existed that the children could return to the father's care and therefore, offering services was futile. Even if the father completed the referred services, such as drug and alcohol treatment, random UAs, and other treatment offered, he still would not be fit to parent the children because he is incarcerated. The court's finding was supported by substantial evidence.

## Likelihood that the Father's Parental Deficiencies Would Be Remedied in the Near Future

The father contends that the Department failed to prove that little likelihood existed that the father's parental deficiencies would be remedied in the near future. "A determination of what constitutes the near future depends on the age of the child and the circumstances of the placement." *In re Dependency of T.L.G.*, 126 Wn. App. 181, 204, 108 P.3d 156 (2005). A court will "consider

whether family reunification can occur within the foreseeable future" and ultimately, the "best interests of the child are paramount." *T.L.G.*, 126 Wn. App. at 205. When the Department "inexcusably fails" to offer services to a willing parent, termination will still be deemed appropriate if the services "would not have remedied the parent's deficiencies in the foreseeable future, which depends on the age of the child." *In re Dependency of T.R.*, 108 Wn. App. 149, 164, 29 P.3d 1275 (2001).

Our court has found that one year may seem like forever for a young child. *In re Dependency of A.W.*, 53 Wn. App. 22, 33, 765 P.2d 307 (1988). We have also determined that a placement of six months for a 15-month-old child was not in the near future. *In re Dependency of P.D.*, 58 Wn. App. 18, 27, 792 P.2d 159 (1990). Nevala testified that given the children's ages, the near future would be a week to a month. Although the father expressed his desire for visitation and willingness to complete services, because of his incarceration, J.H.W., Jr., and J.K.W.'s placement would be over seven years. One hundred and fifty-eight months for young children to wait is far more than what this court has determined as the near future.

The father states that incarceration is not equivalent to unfitness. While this is true, courts may consider incarceration-related barriers in rebuttal to the presumption that a parent's deficiencies will improve within 12 months of the dispositional order. *In Matter of Dependency of D.L.B.*, 186 Wn.2d 103, 122, 376 P.3d 1099 (2016). "Neither criminal conduct nor imprisonment alone necessarily

justifies an order of permanent deprivation." *In the Matter of Pawling*, 101 Wn.2d 392, 398, 679 P.2d 916 (1984). However, a court may consider

> "a parent's inability to perform [their] parental obligations because of imprisonment, the nature of the crime committed, as well as the person against whom the criminal act was perpetrated are all relevant to the issue of parental fitness and child welfare, as [is] the parent's conduct prior to imprisonment and during the period of incarceration."

*Pawling*, 101 Wn.2d at 398 (alteration in original) (quoting *Sego*, 82 Wn.2d at 740).

The father's deficiencies include more than his incarceration. The father's parenting deficiencies include substance abuse, domestic violence, and parenting issues as well as the criminal behavior against his sons' mother resulting in his incarceration. Patton testified that the father's lengthy criminal sentence meant that the father would not be a resource for the children. The limitations created by the father's incarceration are a significant barrier for the father to establish any bond with the boys who did not have an established relationship before the father's incarceration. In addition, looking at the nature of the crime and the father's conduct before incarceration, the father had a history of intimate partner violence against the mother and was convicted of assaulting and raping her. The Department found that J.H.W., Jr., likely witnessed intimate partner violence when he was still in the mother and father's care. The court's finding that it was unlikely that the father's parental deficiencies would be remedied in the near future was supported by substantial evidence.

17

Prospects for Early Integration into a Stable and Permanent Home

The father claims that the Department did not prove that the continuation of the relationship between him and the children would diminish their prospects for early integration. The father asserts that the Department did not show that the bond between J.H.W., Jr., and J.K.W. and their foster family would be undermined by a continued relationship with the father. The father asserts that integration would not stop if his rights were preserved.

As required under RCW 13.34.180(1)(f), the element of the children's prospects for early integration can be "satisfied when the parental relationship is an impediment to a legal, permanent placement in an adoptive home." *In re Dependency of A.M.F.*, 1 Wn.3d 407, 418, 526 P.3d 32 (2023).

The focus of this element is the " 'continued effect of the *legal* relationship between parent and child, as an obstacle to adoption; it is especially a concern where children have potential adoption resources.' " *A.M.F.*, 1 Wn.3d at 417 (quoting *In re Dependency of A.C.*, 123 Wn. App. 244, 250, 98 P.3d 89 (2004)). Our court has previously held that "the existence of prospective adopters who already have a custodial relationship with the child" is sufficient to meet this element. *In re Dependency of A.M.F.*, 23 Wn. App. 2d 135, 146, 514 P.3d 755 (2022).

J.H.W., Jr., and J.K.W. have been in their foster family's care since 2020, and the foster family testified about their absolute preference for adoption. J.K.W. has lived with his foster family since he was four months old, and J.H.W.,

Jr., since he was about two years old.  J.H.W., Jr., and J.K.W.'s foster family testified that while J.H.W., Jr., knows that the father is his dad, they do not think that J.K.W. fully understands.  The caregivers testified that the boys "don't know who [the father] is."  Because the boys have an option for permanent placement, we find that the trial court did not err.

### Best Interest of the Children

The father argues that the Department did not prove that termination is in the children's best interest because "growing ties to their foster family are [in]sufficient to prove that termination is in their best interest."  The father further claims that termination is not in the children's best interest because "it would permanently deprive them of the care and companionship of a sincerely loving father."

Once the elements of RCW 13.34.180(1) are proven, the court must still determine whether termination is in the best interests of the child.  RCW 13.34.190(1)(b).  The dominant consideration in a parental rights termination proceeding is the moral, intellectual, and material welfare of the child.  *T.R.*, 108 Wn. App. at 161.   The Department must prove by a preponderance of the evidence that termination is in the child's best interests.  *In re Welfare of A.B.*, 168 Wn.2d 908, 911-12, 232 P.3d 1104 (2010).  Whether termination is in the best interest of the children is fact dependent, and "courts therefore consider a broad range of nonexclusive factors."  *A.M.F.*, 23 Wn. App. 2d at 147.  "Where a parent has been unable to rehabilitate over a lengthy dependency period, a court

is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo." *T.R.*, 108 Wn. App. at 167 (alteration in original) (quoting *A.W.*, 53 Wn. App. at 33.).

The trial court found that termination was in the best interest of J.H.W., Jr., and J.K.W. because the children could achieve permanency through adoption. If the father's rights were not terminated, J.H.W., Jr., and J.K.W. would have to wait at least seven years until they could be in their father's care again. After the father is released from incarceration, the father would still need to correct his parenting deficiencies, find housing and a stable income before he could have the children back in his care. Both boys need permanency, especially J.H.W., Jr. After video visitations with the father, the foster family observed J.H.W., Jr., experience behavioral issues and lashing out. The court found that because of J.H.W., Jr.'s, social and emotional issues, he needs structure, consistency, and stability. Permanent adoption is in the best interest of the children given their age and social and emotional needs. Substantial evidence supports the trial court's determination that the State proved by a preponderance of the evidence that preserving the father's parental rights is not in the best interest of the children, despite the father's sincere love for them.

### Statutory Requirement to Address Other Sibling's Relationships

Lastly, the father argues that the termination order is invalid because it did not include a statement addressing the status of the child's sibling relationships.

RCW 13.34.200(3) states that "an order terminating the parent-child relationship shall include a statement addressing the status of the child's sibling relationships and the nature and extent of sibling placement, contact, or visits." The Legislature's use of *shall* indicates that this is mandatory. *Erection Co. v. Dep't of Lab. & Indus.*, 121 Wn.2d 513, 519, 852 P.2d 288 (1993). Therefore, the trial court's decision is not complete without including such a statement. Our court has found that this requirement "is more akin to a ministerial requirement that ensures that the termination order acknowledges the existence and status of sibling relationships." *In re Dependency of J.D.P.*, 17 Wn. App.2d 744, 759, 487 P.3d 960 (2021). But this does not mean that we do not recognize the importance of sibling relationships nor does it mean that it is permissible for the court to ignore this requirement. Though "the status of sibling relations is not a required element to support a termination finding[,] . . . the trial court must include a statement concerning the status of sibling relationships." *J.D.P.*, 17 Wn. App. 2d at 759.

The legislative intent of RCW 13.34.200(3) was to recognize "the importance of sibling relationships" and to encourage "courts and public agencies to consider the sibling relationships when intervening in the family situations." H.B. REP., ENGROSSED SUBSTITUTE S.B. (ESSB) 5779, at 2, 58th Leg., Reg. Sess. (Wash. 2003). The House Bill Report also stated that the legislature did not "intend[] to create any new relationships which do not currently exist." *Id.*

The record from the trial established significant information regarding sibling relationships. J.H.W., Jr., and J.K.W. have a total of four older siblings, two on their father's side and two on their mother's side. At trial, the father testified that both of his older children live with their respective mothers. Before dependency, when the father and mother lived together, the father testified that his second oldest child came over to his house "every other day." The father testified that J.H.W., Jr., and his oldest son saw each other at least two or three times a month and spent the holidays together.[5] Additionally, the mother had two older children who lived in the home when J.H.W., Jr., was born.

In 2020, when J.H.W., Jr., was removed from the mother and father's care, he was placed with the mother of the father's second oldest child. Four months later, J.H.W., Jr., was moved to a foster home. Savage, the boys' social worker, testified that J.H.W., Jr., had not seen his older siblings since 2020. J.K.W. met his oldest brother once at the Department's office. J.H.W., Jr.'s, teacher testified that the only sibling that he mentioned at school was J.K.W.

The children's relationship with their other siblings is mentioned throughout the record. The record provides information regarding the interactions between the boys and the father's other children. Although the boys' relationship with the older children may not be a determinative factor regarding the termination of the father's rights, the court's findings failed to include any information about the children's siblings as is required by the statute. We

---

[5] The father testified that the last time J.H.W., Jr., and the oldest child spent the holidays together was in 2019.

remand for entry of such findings consistent with the record which address the requirements stated in RCW 13.34.200(3).

We affirm in part and remand for findings consistent with the requirement RCW 13.34.200(3) to address the children's sibling relationships.

_____

WE CONCUR:

_____          _____
Feldman, J.                      Fearing, J.